

## Fourth Court of Appeals
### San Antonio, Texas

## MEMORANDUM OPINION

No. 04-22-00332-CV

Bruce **WEBB**,
Appellant

v.

Horst **GROSSPETER**,
Appellee

From the 293rd Judicial District Court, Dimmit County, Texas
Trial Court No. 22-01-14102-DCV
Honorable Maribel Flores, Judge Presiding

Opinion by:    Beth Watkins, Justice

Sitting:    Rebeca C. Martinez, Chief Justice
Beth Watkins, Justice
Liza A. Rodriguez, Justice

Delivered and Filed: February 22, 2023

AFFIRMED

Appellant Bruce Webb challenges the trial court's May 12, 2022 order denying his special appearance. We affirm the trial court's order.

### BACKGROUND

Webb, who lives in Alaska, is the president of Helena Energy, LLC, a Delaware limited liability company. During the time relevant to this lawsuit, Helena's business consisted almost

entirely of oil and gas operations in Texas.[1] Webb is also the president and only officer of four other entities that conduct oil and gas operations in Texas.

In 2018, appellee Horst Grosspeter, a resident of Germany, agreed to loan Helena $1,750,000 to purchase equipment for one of Helena's Dimmit County, Texas oil and gas leases. Webb signed a commitment letter and a promissory note memorializing the loan. The commitment letter identified the purpose of Grosspeter's loan as "Purchase of the Equipment," and the promissory note stated Grosspeter had advanced the funds "in order to finance certain equipment to be used in connection with a water offtake contract[.]" Webb also signed a mortgage on Helena's Dimmit County oil and gas leases securing the promissory note and other debts. The mortgage specified that the $1,750,000 loan was "to be documented by" the terms of the promissory note. Grosspeter's live petition refers to the purchase of the equipment identified in the commitment letter and promissory note as the "Intended Purpose" of the loan.

The then-operator of Helena's wells, SPRI Oil and Gas, LLC, received Grosspeter's loan in March of 2018. Grosspeter alleges that instead of being used to purchase the equipment listed in the commitment letter and promissory note, $650,000 of the loan was wired from SPRI's Houston bank account to the offshore account of Helena's owner, Kay Rieck. Grosspeter alleges this transfer occurred with Webb's knowledge and consent.

In November and December of 2021, Grosspeter notified Helena that it was in default and he intended to foreclose on the mortgage. On January 21, 2022, Grosspeter filed an application in Dimmit County District Court seeking a temporary restraining order and a temporary injunction against Helena and another entity, Black Gold Operating Co., LLC, which by that time had replaced SPRI as the operator on Helena's oil and gas leases. Like Helena, Black Gold is a Delaware limited liability company, and Webb is its president. Unlike Helena,

---

[1] Helena's only business outside Texas during the relevant time was an Arkansas gas sales contract.

however, Webb originally organized Black Gold as a Texas limited liability company, and its filings with the Texas Railroad Commission still show a Texas address.

Grosspeter's application for temporary relief alleged that Helena was in default on its debt to Grosspeter; both Helena and Black Gold had failed to produce records Grosspeter was entitled to receive; and "Black Gold and Helena are not expected to voluntarily cooperate with the purchaser of the Mortgaged properties following the foreclosure sale[.]" The trial court signed a temporary restraining order and an agreed temporary injunction. Grosspeter subsequently foreclosed on Helena's Dimmit County leases.

After the foreclosure, Grosspeter filed a first amended petition that added Webb as a defendant. Grosspeter also added veil-piercing allegations that sought to hold Black Gold and Webb liable for Helena's actions. The veil-piercing allegations recited that Webb had "at all times, actively directed, and participated with, Helena and Black Gold in their fraudulent activities in diverting funds advanced by [Grosspeter]." The petition did not explicitly assert a separate fraud or conspiracy cause of action.

After Grosspeter filed his first amended petition, Helena, Black Gold, and Webb filed a special appearance. Webb argued the trial court lacked personal jurisdiction over him because he was domiciled in Alaska. He also argued that the fiduciary shield doctrine barred the trial court from exercising jurisdiction over him because his only relevant contacts with Texas occurred when he was acting as the agent of a business entity.

Grosspeter then amended his petition several times, adding fraud and conspiracy claims, more detailed jurisdictional allegations, and a claim that the defendants "compounded their fraud . . . by diverting an additional $450,000" of Grosspeter's loan to pay debts unrelated to the "intended purpose." In his live petition, Grosspeter alleged that Webb and the other defendants falsely represented that Grosspeter's loan would be used for the "Intended Purpose" even though

they "knew that most of the $1,750,000 would be used for" other purposes. Grosspeter's live petition also alleged that Webb individually had made multiple contacts with Texas. After he amended his petition, Grosspeter filed a written response to the special appearance and evidence in support of that response.

Helena, Black Gold, and Webb did not amend their special appearance to address Grosspeter's new allegations, but they filed a reply to Grosspeter's response. Like the special appearance, the reply argued that Webb was domiciled in Alaska and the fiduciary shield doctrine barred the trial court from imputing either Helena's or Black Gold's Texas contacts to Webb. Neither the special appearance nor the reply asserted any other challenges to Grosspeter's jurisdictional allegations against Webb.

Following an evidentiary hearing at which Webb testified and both sides presented documentary evidence, the trial court signed an order denying the special appearance. Webb appealed.[2]

## ANALYSIS

### *Standard of Review*

A nonresident defendant challenges a Texas trial court's personal jurisdiction over him by filing a special appearance under Texas Rule of Civil Procedure 120a. *See* TEX. R. CIV. P. 120a. Whether a court has personal jurisdiction over a nonresident defendant is a question of law, and we review the trial court's ultimate legal conclusions de novo. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). "However, the trial court frequently must resolve questions of fact before deciding the jurisdiction question," and we review the trial

---

[2] Neither Helena nor Black Gold are parties to this appeal. Black Gold voluntarily withdrew its special appearance, and Helena did not file a notice of appeal.

court's underlying fact findings, both express and implied, for legal and factual sufficiency. *Id.* at 794–95.

"The plaintiff bears the initial burden of pleading allegations that suffice to permit a court's exercise of personal jurisdiction over the nonresident defendant." *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 66 (Tex. 2016). This burden requires the plaintiff to plead facts that establish: (1) the Texas long-arm statute authorizes the exercise of jurisdiction; and (2) the exercise of jurisdiction over the nonresident defendant is "consistent with federal and state constitutional guarantees of due process." *Schlobohm v. Schapiro*, 784 S.W.2d 355, 356 (Tex. 1990). If the plaintiff does not plead facts that bring the defendant within the Texas long-arm statute, "the defendant need only prove that it does not live in Texas to negate jurisdiction." *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658–59 (Tex. 2010). But if the plaintiff's allegations are sufficient, the burden shifts to the defendant to negate all bases of personal jurisdiction alleged by the plaintiff. *Searcy*, 496 S.W.3d at 66.

"The court shall determine the special appearance on the basis of the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony." TEX. R. CIV. P. 120a(3). Where, as here, the trial court does not issue findings of fact and conclusions of law, we imply all findings of fact that are necessary to support the trial court's ruling if those findings are supported by the evidence. *Kelly*, 301 S.W.3d at 657.

### *Applicable Law*

#### *Personal Jurisdiction Generally*

"The Due Process Clause of the Fourteenth Amendment constrains a State's authority to bind a nonresident defendant to a judgment of its courts." *Walden v. Fiore*, 571 U.S. 277, 283

(2014). A personal jurisdiction analysis therefore requires an examination of both state and federal law. *Searcy*, 496 S.W.3d at 66.

The Texas long-arm statute identifies three activities that constitute "do[ing] business in this state": (1) contracting with a Texas resident "and either party is to perform the contract in whole or in part in" Texas; (2) committing a tort in Texas; or (3) recruiting Texas residents for employment. TEX. CIV. PRAC. & REM. CODE ANN. § 17.042. However, that list is not exhaustive. *Id.*; *BMC Software*, 83 S.W.3d at 795. The broad language of the Texas long-arm statute permits the trial court's jurisdiction to "reach as far as the federal constitutional requirements of due process will allow." *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007) (internal quotation marks omitted). To satisfy these due process requirements, the plaintiff must allege facts showing: (1) the defendant has established "minimum contacts" with Texas; and (2) Texas's assertion of jurisdiction would not "offend traditional notions of fair play and substantial justice." *Searcy*, 496 S.W.3d at 66 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

"A defendant establishes minimum contacts with a state when it purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009) (internal quotation marks omitted). The defendant's contacts with Texas must support the conclusion that it "could reasonably anticipate being subject to the jurisdiction of the Texas court system." *Haddad v ISI Automation Int'l, Inc.*, No. 04-09-00562-CV, 2010 WL 1708275, at *3 (Tex. App.—San Antonio Apr. 28, 2010, no pet.) (mem. op.). We consider only the defendant's contacts with Texas itself, not other parties' contacts with Texas or the defendant's contacts with persons who live in Texas. *Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 561 (Tex. 2018). We must also assess each defendant's contacts with Texas

individually. *PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 172 (Tex. 2007). "The purpose of the minimum-contacts analysis is to protect the defendant from being haled into court when its relationship with Texas is too attenuated to support jurisdiction." *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002).

Federal due process jurisprudence divides the minimum contacts analysis into "two strains of personal jurisdiction: specific and general." *Searcy*, 496 S.W.3d at 67. In his first and second issues on appeal, Webb argues the trial court did not have either general or specific jurisdiction over him. We begin with Webb's challenge to the trial court's exercise of specific jurisdiction.

*Specific Jurisdiction—Applicable Law*

In a specific jurisdiction analysis, we focus our attention on the relationship between the defendant, the forum, and the litigation. *Moki Mac*, 221 S.W.3d at 575–76. "Specific jurisdiction . . . arises when (1) the defendant purposefully avails itself of conducting activities in the forum state, and (2) the cause of action arises from or is related to those contacts or activities." *Kelly*, 301 S.W.3d at 658 (internal quotation marks omitted, alteration in original).

A cause of action arises from or is related to a nonresident's forum contacts if there is "a substantial connection between those contacts and the operative facts of the litigation." *Moki Mac*, 221 S.W.3d at 585. Additionally, the relationship between the defendant and the forum "must arise out of contacts that the defendant *himself* creates with the forum State." *Walden*, 571 U.S. at 284 (emphasis in original, internal quotation marks omitted). "In determining whether a nonresident tortfeasor's acts support the forum state's exercise of jurisdiction over him, '[t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way.'" *Hanor v. Hanor*, No. 04-

20-00142-CV, 2020 WL 7364659, at \*5 (Tex. App.—San Antonio Dec. 16, 2020, no pet.) (mem. op.) (quoting *Walden*, 571 U.S. at 290).

### *Application*

### *Texas Long-Arm Statute*

Grosspeter bore the initial burden of pleading facts sufficient to bring Webb within the Texas long-arm statute. *Moki Mac*, 221 S.W.3d at 574. In his live petition, Grosspeter alleged: (1) Webb is the president of five oil and gas companies, including Helena, that operate exclusively in Texas; (2) Helena's presentations to potential investors identified Webb as "key management" of oil and gas wells in Texas; (3) Webb directed Helena's day-to-day operations; (4) Webb signed the promissory note under which Grosspeter lent money to Helena, as well as the mortgage that secured that note; (5) the promissory note signed by Webb set out the intended purpose for Grosspeter's loan to Helena; (6) Webb falsely represented to Grosspeter that his loan would be used for Dimmit County oil and gas operations; and (7) Webb participated in a conspiracy to defraud Grosspeter by authorizing a transfer of a portion of Grosspeter's loan from SPRI's Houston bank account for uses other than the intended purpose.

The core of these allegations is that Webb made representations to Grosspeter regarding funds intended for use in a Texas oil and gas operation overseen or managed by Webb. We conclude such allegations were sufficient to bring Webb within the broad reach of the Texas long-arm statute. *See* TEX. CIV. PRAC. & REM. CODE § 17.042; *Zac Smith & Co., Inc. v. Otis Elevator Co.*, 734 S.W.2d 662, 665–66 (Tex. 1987) (concluding Texas had jurisdiction over Florida corporation with "no physical ties to Texas" because it was party to a joint venture "formed for the sole purpose of building a hotel in Texas"). We therefore turn to the question of whether the trial court's exercise of personal jurisdiction over Webb is consistent with constitutional due process requirements. *Retamco*, 278 S.W.3d at 337–38.

*Due Process*

By concluding it could exercise specific jurisdiction over Webb, the trial court implicitly found: (1) Webb purposefully availed himself of doing business in Texas; and (2) there is a substantial connection between Webb's contacts with Texas and the operative facts of this litigation. *See, e.g., id.* at 338, 340. The trial court also necessarily concluded that its exercise of jurisdiction over Webb would not offend traditional notions of fair play and substantial justice. *See Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 154 (Tex. 2013). We examine each of these implied findings separately to determine if they are supported by legally and factually sufficient evidence. *See BMC Software*, 83 S.W.3d at 794–95.

1.      Purposeful availment

"Purposeful availment requires that a defendant must seek some benefit, advantage, or profit by availing itself of the jurisdiction." *Moki Mac*, 221 S.W.3d at 578 (internal quotation marks omitted). "Due process requires purposeful availment because personal jurisdiction is premised on notions of implied consent—that by invoking the benefits and protections of a forum's laws, a nonresident consents to suit there." *TV Azteca v. Ruiz,* 490 S.W.3d 29, 37 (Tex. 2016) (internal quotation marks omitted).

During the hearing on the special appearance, Webb testified he had never engaged in business in Texas in his individual capacity. He testified that he did not negotiate the promissory note or mortgage associated with Grosspeter's loan and claimed he only signed those documents because Helena's owner, Rieck, told him to do so. Webb also testified, however, that he is the president and only officer of at least five oil and gas companies that operate solely in Texas; he originally organized Black Gold as a Texas entity; he is "legally responsible" for overseeing approximately 200 wells in Texas, including the Helena wells involved in Grosspeter's loan; he

is paid in his individual capacity for overseeing the Texas wells;[3] and he was personally promised a ten percent interest in Helena's Dimmit County oil and gas leases as compensation for his work overseeing those leases.[4]

Additionally, while Webb stated he had never directly solicited any of Helena's investors, he testified that he participated in a teleconference in which Rieck "was trying to get further investments from Mr. Grosspeter" and that his task during that conference was to "describe what was going on in Texas." He acknowledged that SPRI had created presentations aimed at potential investors in Helena's Dimmit County oil and gas operations that described Webb and two other individuals as "[e]xperienced operators in the South Texas market" who had a "[d]eep understanding of the esoteric risks and nuances involved in production in South Texas." Webb agreed that those presentations were sent to him, he read them, and he did not object to any of the representations being made to Helena's potential investors. *Cf. Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005) ("[A] nonresident that directs marketing efforts to Texas in the hope of soliciting sales is subject to suit here in disputes arising from that business.").

Finally, Webb testified during his deposition that the mortgage he signed is a contract that was performable in Texas with respect to Texas properties. *See Zac Smith & Co.*, 734 S.W.2d at 665. He also testified during his deposition that he flew to Texas in June of 2019 to meet personally with people who were owed money and "to work with all the debts." While Webb did not specifically testify that "all the debts" included Helena's debt to Grosspeter, especially considering the timeframe, the trial court could have reasonably made that inference.

---

[3] Webb testified he is paid for overseeing the Texas wells not as an employee, but through a "1099 miscellaneous" arrangement in which he invoices Helena and Black Gold via his sole proprietorship, Webb Management Services. Webb described Webb Management Services as "not a real company," and he agreed that a payment to Webb Management Services was a payment to Webb individually.

[4] It is unclear whether Webb ever received this ten percent interest.

*See Elk River, Inc. v. Garrison Tool & Die, Ltd.*, 222 S.W.3d 772, 787–88 (Tex. App.—Dallas 2007, pet. denied) (considering a trial court's reasonable inference in personal jurisdiction analysis).

Based on this evidence, the trial court could have reasonably found that Webb purposefully reached into Texas to profit from this state's oil and gas industry. *Cf. Moki Mac*, 221 S.W.3d at 578–79; *see also TV Azteca*, 490 S.W.3d 51–52 (defendant that intentionally targeted Texas market was subject to specific jurisdiction in this state); *Yujie Ren v. ANU Res., LLC*, 502 S.W.3d 840, 850 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (defendant's "contacts with Texas were purposeful and substantial . . . because they were aimed at acquiring and developing [oil and gas] business in Texas"). The trial court also could have reasonably determined that these connections to Texas were not random, fortuitous, attenuated, or based on the unilateral activity of another party or a third person. *See Retamco*, 278 S.W.3d at 338–39. Under these circumstances, we cannot say that Webb could not have anticipated being haled into a Texas court in a dispute arising out of Grosspeter's loan to Helena. *See Haddad*, 2010 WL 1708275, at *6. Accordingly, the evidence is legally and factually sufficient to support the trial court's implied finding that Webb purposefully availed himself of Texas.

    2.    <u>Substantial connection to the litigation</u>

For the trial court to exercise specific jurisdiction over Webb, the record must also support a finding that Webb's contacts with Texas are substantially connected to the operative facts of the litigation. *See Moki Mac*, 221 S.W.3d at 585. "To identify the operative facts of the litigation, we select those facts that would be the focus of the trial." *Info. Servs. Grp., Inc. v. Rawlinson*, 302 S.W.3d 392, 398 (Tex. App.—Houston [14th Dist.] 2009, pet. denied).

A trial on Grosspeter's claims against Webb would focus on the extent and culpability of Webb's involvement, if any, in soliciting and securing Grosspeter's loan and the subsequent

transfers of funds from that loan. It is undisputed that the intended purpose of the loan was to acquire equipment for a Texas oil and gas project and that Webb signed a promissory note and mortgage that (1): stated that intention; and (2) were performable in Texas. *See Zac Smith & Co.*, 734 S.W.2d at 665–66. Webb also participated in a teleconference intended to solicit investments from Grosspeter, during which Webb "describe[d] what was going on in Texas." Finally, the evidence shows Webb conducts considerable business in the Texas oil and gas market, both with and without Helena, and that he is paid in his individual capacity for that work. *See id.* (noting defendant "anticipated a profit from" Texas project). We conclude this evidence is legally and factually sufficient to support the trial court's finding that Webb's contacts with Texas are substantially connected to the operative facts of this case. *Compare Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 779–80 (1984) (forum state had jurisdiction over nonresident defendant "when the cause of action arises out of the very activity being conducted, in part, in" the forum state), *and Zac Smith & Co.*, 734 S.W.2d at 665–66, *with Moki Mac*, 221 S.W.3d at 579, 585–86 (acts that amounted to "doing business" in Texas did not support specific jurisdiction because alleged liability arose out of different acts committed outside Texas).

3.     Fair play and substantial justice

In his third issue, Webb argues the trial court's exercise of jurisdiction over him offends traditional notions of fair play and substantial justice. "Only in rare cases, however, will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state." *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 18 (Tex. 2021) (internal quotation marks omitted). In deciding this question, "[w]e consider the nonresident defendant's contacts in light of (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial

system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of several states in furthering fundamental substantive social policies." *Id.* at 18–19.

Webb does not argue that it would be burdensome for him to try this case in Texas, nor does he claim that trying this case in another state would be more convenient. He notes, however, that Grosspeter is not a citizen of Texas and that the promissory note is governed by New York law. He also contends "[t]he only real Texas nexus to this case" is that the promissory note was secured by Helena's Dimmit County oil and gas leases, and he explains that those leases no longer belong to any of the defendants because Grosspeter foreclosed on them. Based on these assertions, Webb argues Texas has no interest in adjudicating this dispute.

We disagree. "Efficient energy production is profoundly important to Texas and to the nation[.]" *Coastal Oil & Gas Corp. v. Garza Energy Tr.*, 268 S.W.3d 1, 27 (Tex. 2008) (Willett, J., concurring). It is well-established that "the longstanding policy of this state [is] to encourage maximum recovery of minerals[.]" *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 51 (Tex. 2017); *Key Operating & Equip., Inc. v. Hegar*, 435 S.W.3d 794, 798 (Tex. 2014). In light of these policy considerations, we decline to hold that Texas has no interest in adjudicating Grosspeter's claim that he was defrauded in connection with an investment in a Texas oil and gas operation. *See Yujie Ren*, 502 S.W.3d at 852; *ERC Midstream LLC v. Am. Midstream Partners, LP*, 497 S.W.3d 99, 112 (Tex. App.—Houston [14th Dist.] 2016, no pet.).

After reviewing the record, we conclude Grosspeter's pleadings and evidence were sufficient to shift the burden to Webb to negate Grosspeter's jurisdictional allegations. *See* TEX. R. CIV. P. 120a(3); *Searcy*, 496 S.W.3d at 66.

*Did Webb Negate Grosspeter's Jurisdictional Allegations?*

A defendant can attack a plaintiff's jurisdictional allegations on either a factual or a legal basis:

Factually, the defendant can present evidence that it has no contacts with Texas, effectively disproving the plaintiff's allegations. The plaintiff can then respond with its own evidence that affirms its allegations, and it risks dismissal of its lawsuit if it cannot present the trial court with evidence establishing personal jurisdiction. Legally, the defendant can show that even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; the defendant's contacts with Texas fall short of purposeful availment; for specific jurisdiction, that the claims do not arise from the contacts; or that traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction.

*Kelly*, 301 S.W.3d at 659 (footnotes omitted). Here, as noted above, Webb's special appearance and reply in support of the special appearance argued that he is domiciled in Alaska. Because Grosspeter pleaded facts that are sufficient to bring Webb within the Texas long-arm statute, a showing that Webb is domiciled outside of Texas, without more, will not negate Grosspeter's jurisdictional allegations. *Cf. id.* at 658–59.

Webb's special appearance and reply also contended that the fiduciary shield doctrine bars Texas from exercising jurisdiction over him because all of his relevant conduct in Texas occurred while he was acting as an agent for Helena or Black Gold. The fiduciary shield doctrine provides that "[a]n individual's transaction of business within Texas solely as a corporate officer or employee does not create personal jurisdiction over that individual even though a Texas court has in personam jurisdiction over the corporation." *Morris v. Powell*, 150 S.W.3d 212, 218 (Tex. App.—San Antonio 2004, no pet.), *declined to follow on other grounds by Michiana*, 168 S.W.3d at 788 n.63. However, corporate agents may be "individually liable for fraudulent or tortious acts committed while in the service of their corporation." *Ennis v. Loiseau*, 164 S.W.3d 698, 707–08 (Tex. App.—Austin 2005, no pet.) (internal quotation marks omitted). Accordingly, "the fiduciary shield doctrine does not protect a corporate employee from the exercise of specific jurisdiction as to torts for which the employee may be held individually liable." *Morris*, 150 S.W.3d at 218–19; *Stern v. KEI Consultants, Ltd.*, 123 S.W.3d 482, 485 (Tex. App.—San

Antonio 2003, no pet.); *see also Yujie Ren*, 502 S.W.3d at 849–50; *SITQ E.U., Inc. v. Reata Rest., Inc.*, 111 S.W.3d 638, 650–51 (Tex. App.—Fort Worth 2003, pet. denied). While an individual's contacts with Texas should not be analyzed based on his employer's activities, his status as an employee does not insulate him from the trial court's specific jurisdiction over allegations of tortious conduct where he has "some direct, personal participation in the tort[.]" *Morris*, 150 S.W.3d at 219. Stated differently, "[t]here is no blanket protection from [specific] jurisdiction simply because a defendant's alleged acts were done in a corporate capacity." *SITQ,* 111 S.W.3d at 651.

Grosspeter's live petition alleged that Webb individually made false representations to Grosspeter and engaged in a conspiracy to defraud Grosspeter. The evidence shows that the allegedly false representations appear in the commitment letter, promissory note, and mortgage Webb signed. At least one of our sister courts has recognized that a defendant's corporate officer status will not shield him from the trial court's exercise of specific jurisdiction when the plaintiff's claims arise from "misrepresentations in the agreements [the corporate officer defendant] signed." *Norstrud v. Cicur*, No. 02-14-00364-CV, 2015 WL 4878716, at *9 n.7 (Tex. App.—Fort Worth Aug. 13, 2015, no pet.) (mem. op.). We agree with this analysis and conclude that under these circumstances, the fiduciary shield doctrine does not apply to the trial court's exercise of specific jurisdiction over Webb. *See id.* at *10; *Morris*, 150 S.W.3d at 219.

On appeal, Webb appears to have abandoned the fiduciary shield doctrine as a challenge to the trial court's exercise of specific jurisdiction. Instead, he now argues the trial court may not exercise specific jurisdiction over him because there is no evidence to support one or more required elements of Grosspeter's fraud and conspiracy claims. But "ultimate liability in tort is not a jurisdictional fact, and the merits of the cause are not at issue" in a jurisdictional analysis. *Wright v. Sage Eng'g, Inc.*, 137 S.W.3d 238, 251 n.10 (Tex. App.—Houston [1st Dist.] 2004,

pet. denied). Accordingly, Webb's challenge to the underlying merits of Grosspeter's claims does not negate Grosspeter's jurisdictional allegations. *See id.*

Because Webb relied solely on the inapplicable fiduciary shield doctrine to challenge specific jurisdiction in the trial court, he did not meet his burden to negate Grosspeter's jurisdictional allegations. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 17.042; *Zac Smith & Co.*, 734 S.W.2d at 664 ("Once it is determined that the defendant purposefully availed itself of the benefits and protections of the laws of the forum, the burden is on the defendant to show a compelling case that the presence of some other considerations would render jurisdiction unreasonable.") (internal quotation marks omitted). We therefore overrule Webb's second and third issues. Because the trial court did not err by concluding it had specific jurisdiction over Webb, we need not consider Webb's first issue regarding general jurisdiction. TEX. R. APP. P. 47.1; *Phillips Dev. & Realty, LLC v. LJA Eng'g, Inc.*, 499 S.W.3d 78, 83 n.4 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

## CONCLUSION

We affirm the trial court's order.

Beth Watkins, Justice